## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

May 16 2017, 10:54 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jonathan T. Feavel
Feavel & Porter, LLP
Vincennes, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| S.C., <br> *Appellant-Respondent,* <br><br> v. <br><br> Indiana Department of Child Services, Local Knox County Office, <br> *Appellee-Petitioner.* | May 16, 2017 <br><br> Court of Appeals Case No. <br> 42A01-1611-JT-2618 <br><br> Appeal from the Knox Superior Court <br><br> The Honorable J. David Holt, Senior Judge <br><br> Trial Court Cause No. <br> 42D01-1603-JT-6 |

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Respondent, S.C. (Father), appeals the trial court's order terminating his parental rights to his minor child, S.L.C. (Child).

We affirm.

# ISSUE

Father raises five issues on appeal, which we consolidate and restate as the following single issue: Whether the trial court clearly erred in terminating Father's parental rights.

# FACTS AND PROCEDURAL HISTORY

Father and T.R. (Mother)[1] are the biological parents of the Child, born on February 13, 2013. Father and Mother are not married, although they have maintained a relationship and have periodically resided together in Bicknell, Knox County, Indiana. At some point after the Child's birth, Father believed that he signed a paternity affidavit. Father and Mother both have other children from different relationships, but the Child is their only shared biological child.

In May and June of 2014, the Knox County Department of Child Services (DCS) received reports that Father and Mother were using methamphetamine

---

[1] Mother voluntarily relinquished her parental rights to the Child on July 19, 2016. She does not participate in this appeal.

while caring for the Child. However, DCS was unable to locate the parents to follow up with an investigation. Then, on August 13, 2014, DCS received a report alleging parental neglect of the Child. This report described that Father and Mother had left their eighteen-month-old Child in the care of a family friend for several weeks; however, when the Child fell ill and the family friend could no longer provide care, Father and Mother refused to pick up the Child. As a result, the family friend contacted Officer Kevin Carroll (Officer Carroll) of the Bicknell Police Department, who is the Child's uncle by virtue of his marriage to Mother's sister. Officer Carroll retrieved the Child from the family friend's home and took her to the home of Mother's other sister, S.C. (Aunt S.C.), who had previously cared for the Child for extended periods of time and had even (unsuccessfully) attempted to obtain guardianship over the Child in early 2014. At some point, Father and Mother arrived at Aunt S.C.'s home, which prompted Aunt S.C. to call Officer Carroll for assistance. Officer Carroll advised the parents that they would need to make contact with DCS.

[6] After receiving the report, DCS went to Aunt S.C.'s home and visibly observed that the Child was sick and in need of medical care. However, Father and Mother could not be located, and Aunt S.C. did not have authority to obtain medical treatment without parental consent. Thus, DCS obtained judicial permission to detain the Child on an emergency basis and officially placed her in Aunt S.C.'s care. Later that day, Father and Mother arrived at the DCS office and spoke with the investigating family case manager. Both were angry that the Child had been taken into DCS custody and denied that they had left

the Child in the care of anyone for more than one day. Although Father and Mother refused to submit to a drug screen, they denied allegations of drug use. However, DCS observed that both parents appeared to be under the influence of some substance during their interviews. Specifically, during the interview, Father "would be staring blankly and then he would redirect with fast paced statements towards [the DCS family case manager]." (Tr. p. 74). On the other hand, Mother "would yell and then cry and then she would have no emotion." (Tr. p. 83). Father and Mother did admit that they were homeless and living with a friend. According to Officer Carroll, the friend with whom the parents were staying was a well-known drug user, and DCS was advised that both Father and Mother had a history of problems with substance abuse.

[7] On August 14, 2014, DCS filed a petition alleging the Child to be a Child in Need of Services (CHINS). That day, the trial court held an initial hearing and appointed a court-appointed special advocate (CASA) to represent the Child's interests. The trial court also conducted a detention hearing and determined that the Child's detainment was necessary for the Child's protection. On August 21, 2014, the trial court resumed the initial hearing, during which Father and Mother denied DCS' allegations in the CHINS petition. On October 9, 2014, the trial court conducted a hearing on DCS' CHINS petition, at which time, Father and Mother both admitted to the allegations raised in the CHINS petition. Specifically, the parents agreed

> that the [C]hild's physical or mental condition was seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the [C]hild's parents to supply the [C]hild

with necessary[] food, clothing, shelter, mental care, education, or supervision and that the [C]hild . . . needs care, treatment, or rehabilitation that the [C]hild is unlikely to be provided or accepted without the coercive intervention of the court.

(Appellant's App. Vol. V, p. 7). Accordingly, the trial court adjudicated the Child to be a CHINS.

[8] On November 7, 2014, the trial court conducted a dispositional hearing and subsequently issued a dispositional order. The trial court ordered that the Child remain in her current placement with Aunt S.C. and that the parents participate with the services recommended by DCS. In particular, the trial court directed Father and Mother to, in relevant part, contact DCS on a weekly basis for monitoring compliance; notify DCS of any changes in contact information, employment status, arrests or criminal charges; enroll in any programs recommended by DCS within a reasonable time and participate in the program without delay or missed appointments; "maintain suitable, safe and stable housing with adequate bedding, functional utilities, adequate supplies of food and food preparation facilities"; "secure and maintain a legal and stable source of income"; refrain from consuming any illegal controlled substances; submit to random drug and alcohol screens within one hour of being requested to do so; and attend all scheduled visits with the Child. (Appellant's App. Vol. V, p. 4). In addition, the trial court ordered Father to pay $25.00 per week and Mother to pay $10.00 per week for the Child's support.

[9] Initially, the parents appeared willing to cooperate with their case plans. DCS referred Father and Mother to a home-based case manager for assistance with housing, employment, financial stability, supervised visitations, and sobriety. Father and Mother did not have stable housing and were staying with various friends, so the home-based case manager focused on the employment issue first as the housing issue could be easier remedied once there was income. With the home-based case manager's assistance, Father secured a job with a heating and cooling company and also obtained his driver's license. For a few months, the parents engaged in regular visitation with the Child and demonstrated appropriate interactions and a loving bond. Father also admitted that he struggled with an addiction to methamphetamine and indicated his desire to enter the recommended in-patient treatment program. However, once Father was actually scheduled to begin treatment, he refused. In addition, Father quit his job after only three months over a dispute with the boss concerning his salary, and he did not subsequently seek new employment. Father also consistently refused to submit to DCS' requests for drug screens, and on a few occasions where he did submit to a screen, he tested positive for methamphetamine.

[10] In January of 2015, Father stopped visiting the Child in order to evade arrest on a warrant that had been issued after he failed to appear for a probation matter. At that time, Father also ceased communicating with DCS and refused any further services. Around June of 2015, Father turned himself into law enforcement and was sent to the Indiana Department of Correction (DOC) to

execute a previously suspended sentence for identity deception. During the months that he was on the run, Father was charged with a new crime of burglary. Additionally, throughout the CHINS case, Mother was either incarcerated or non-compliant with the services necessary to obtain sobriety and stability. Mother consistently tested positive for methamphetamine, even during her pregnancy with the Child's younger half-sibling, who is now also placed in Aunt S.C.'s care. Although an income-withholding order was in place during Father's brief period of employment, it appears that Father and Mother did not otherwise pay child support as ordered.

[11]     On March 15, 2016, DCS filed a petition to terminate the parental rights of Father and Mother.[2] On July 19, 2016, the trial court conducted a fact-finding hearing. At the beginning of the hearing, Mother informed the trial court that she wished to voluntarily relinquish her parental rights; thereafter, the matter proceeded only as to Father. By this time, Father had been incarcerated for nearly a year and had not had any contact with the Child for approximately a year and a half. Father testified that he was scheduled to complete his suspended sentence the following day, although his trial for his pending burglary charge was still a month away. Father testified that he had achieved sobriety during his incarceration and that he planned to obtain housing and employment upon his release. If convicted of his pending charges, Father

---

[2] The petition for termination of parental rights has not been transmitted for our court's review, and the Chronological Case Summary includes only the CHINS (not the termination) proceedings; thus, we relied on the transcript and the trial court's order for the filing date.

stated that he would enroll in the DOC's substance abuse programs. Father expressed his desire to raise the Child. In turn, DCS and Father's home-based case manager testified to Father's non-compliance with his case plan. Based on Father's past history with methamphetamine use and cycles of relapse, the home-based case manager was concerned that Father would not be able to sustain his sobriety without completing treatment. The Child's CASA[3] testified that it would be in the best interests of the Child for the trial court to terminate Father's parental rights in order for Aunt S.C. to pursue adoption of the Child.

[12] On October 18, 2016, the trial court issued its Findings of Fact and Conclusions of Law, accepting Mother's voluntary relinquishment of her parental rights and involuntarily terminating Father's parental rights to the Child. The trial court determined, in pertinent part, that clear and convincing evidence established that there is a reasonable probability that the conditions which resulted in the Child's removal and continued placement outside of Father's care will not be remedied. The trial court further concluded that termination of the parent-child relationship would serve the Child's best interests and that DCS had set forth a satisfactory plan for the care and treatment of the Child.

[13] Father now appeals. Additional facts will be provided as necessary.

---

[3] At some point, a guardian *ad litem* (GAL) was also appointed to serve the Child's interests. The GAL's report was admitted into evidence; however, a copy has not been transmitted to our court on appeal.

# DISCUSSION AND DECISION

## I. *Standard of Review*

Father challenges the termination of his parental rights. It is well established that "[a] parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *In re G.Y.*, 904 N.E.2d 1257, 1259 (Ind. 2009) (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). Accordingly, the Fourteenth Amendment to the United States Constitution safeguards "the traditional right of parents to establish a home and raise their children." *Id.* However, "parental rights are not absolute and must be subordinated to the child's interests." *S.L. v. Ind. Dep't of Child Servs.*, 997 N.E.2d 1114, 1122 (Ind. Ct. App. 2013) (internal quotation marks omitted) (quoting *In re I.A.*, 934 N.E.2d 1127, 1132 (Ind. 2010)). Thus, parental rights may be terminated if the "parents are unable or unwilling to meet their parental responsibilities." *In re G.Y.*, 904 N.E.2d at 1259-60. We recognize that the termination of a parent's rights is "an extreme measure and should only be utilized as a last resort when all other reasonable efforts to protect the integrity of the natural relationship between parent and child have failed." *K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641, 646 (Ind. 2015) (internal quotation marks omitted).

Furthermore, upon review of a trial court's termination of a parent's rights, our court neither reweighs evidence nor assesses the credibility of witnesses. *In re G.Y.*, 904 N.E.2d at 1260. Rather, we "consider only the evidence and reasonable inferences that are most favorable to the judgment." *Id.* In addition,

we note that the trial court issued specific findings of fact and conclusions thereon in granting DCS' petition to terminate Father's rights. Thus, we must engage in the two-tiered standard of review set forth in Indiana Trial Rule 52(A): "[f]irst, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment." *Id.* We "shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Ind. Trial Rule 52(A). We will find clear error only "if the findings do not support the trial court's conclusions or the conclusions do not support the judgment." *In re G.Y.*, 904 N.E.2d at 1260 (quoting *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005)).

## II. *Termination Statute*

[16] In order to terminate a parent's rights, DCS must prove, in relevant part, that a child has been removed from the home for a specific period of time, and

> (B) that one (1) of the following is true:
>     (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>     (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>     (iii) The child has, on two (2) separate occasions, been adjudicated a [CHINS].
> (C) that termination is in the best interests of the child; and
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS is required to prove each of these elements by clear and convincing evidence. *In re G.Y.*, 904 N.E.2d at 1260. Father explicitly concedes that DCS has established that the Child has been removed from his care for the requisite period of time and that there is a satisfactory plan in place for the Child's care.

Father does not specifically challenge any of the trial court's findings. Rather, he challenges the trial court's conclusions that there is a reasonable probability that the conditions resulting in the Child's removal and continued placement outside of the home will not be remedied and that termination of his parental rights is in the Child's best interests. Father further asserts that DCS "infringed on his constitutionally protected right to raise his own [C]hild" by failing to provide services aimed at reunification during Father's incarceration. (Appellant's Br. p. 25).

## A. *Remedy of Conditions*

Father first claims that the trial court erroneously concluded that there is a reasonable probability that the conditions necessitating the Child's removal and continued placement outside of the home will not be remedied. Rather, Father contends that because there is evidence that he "completed some of the recommendations the DCS set forth to reunite with his [C]hild," it cannot be said that he is unwilling or unable to satisfy his parental obligations. (Appellant's Br. p. 20). Father argues that his future plans to obtain adequate housing and income; his lack of prior history with DCS; and his partial

compliance with services "demonstrates his willingness to change the existing conditions and an ability to do so." (Appellant's Br. pp. 22-23).

[19] As previously stated, DCS is required to establish each element of Indiana Code section 31-35-2-4(b)(2) by clear and convincing evidence. *In re G.Y.*, 904 N.E.2d at 1260. The element at issue—Indiana Code section 31-35-2-4(b)(2)(B)—is written in the disjunctive. As a result, DCS need only establish a reasonable probability that *either* the conditions resulting in the Child's removal and continued placement out of the home will not be remedied *or* that the continuation of the parent-child relationship poses a threat to the Child's well-being.[4] *See In re A.K.*, 924 N.E.2d 212, 220-21 (Ind. Ct. App. 2010), *trans. dismissed*. In this case, the trial court concluded that there was a reasonable probability both that conditions would not be remedied and that the continuation of the parent-child relationship poses a threat to the Child's well-being. However, on appeal, Father has solely challenged the determination regarding the remediation of the conditions resulting in removal; he does not assert that the trial court erroneously concluded that the continuation of the parent-child relationship poses a threat to the Child's well-being. As such, Father has effectively conceded that this element—*i.e.*, Indiana Code section 31-35-2-4(b)(2)(B)—was satisfied. Accordingly, we need not address the merits

---

[4] From the record, it is clear that Indiana Code section 31-35-2-4(b)(2)(B)(iii)—concerning a child who has been twice previously adjudicated a CHINS—has no applicability in this case. Thus, relevant to the facts at hand, DCS was required to prove the existence of either Indiana Code section 31-35-2-4(b)(2)(B)(i) (*i.e.*, remediation of conditions) or Indiana Code section 31-35-2-4(b)(2)(B)(ii) (*i.e.*, threat to Child's well-being).

of whether there is a reasonable probability that the conditions resulting in the Child's removal and continued placement outside of the home will not be remedied.

### B. *Best Interests*

[20] Father claims that the trial court erroneously concluded that termination of the parent-child relationship would be in the Child's best interests. The purpose of terminating a parent-child relationship is to protect the child, not to punish the parent. *In re C.C.*, 788 N.E.2d 847, 855 (Ind. Ct. App. 2003), *trans. denied*. When considering whether termination would be in a child's best interests, the trial court must "look beyond the factors identified by [DCS] and . . . look to the totality of the evidence." *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1158 (Ind. Ct. App. 2013), *trans. denied*. The trial court need not wait until a child is "irreversibly harmed before terminating the parent-child relationship." *Id.*

[21] Father contends that he and the Child "have a strong parental-child bond"— that he "interacted with the [C]hild during the visitations and the [C]hild responded to [Father] as her father." (Appellant's Br. p. 23). Father's love for the Child or her recognition of him as her father is not in dispute, and Father's argument ignores the ample evidence (and findings by the trial court) that, notwithstanding his bond with the Child, her best interests require termination of the parent-child relationship. Significantly, Father's persistent failure to achieve stability and sobriety throughout the Child's life resulted in her placement with various relatives and family friends. By the time of the final

hearing, the Child had spent approximately two and a half years of her three-and-a-half-year life in the care of Aunt S.C. Aunt S.C. provided for all of the Child's needs, and the Child was bonded to Aunt S.C., as well as to Aunt S.C.'s husband and other children. Furthermore, Aunt S.C. also had custody of the Child's younger half-sibling, with whom the Child shares a close bond. The trial court found that the Child's need for permanency was paramount, and Aunt S.C. provided the stable lifestyle the Child required. *See A.D.S.*, 987 N.E.2d at 1158 (noting that "'[p]ermanency is a central consideration in determining the best interests of a child'" (alteration in original) (quoting *In re G.Y.*, 904 N.E.2d at 1265)).

[22] For years, Father has struggled with a methamphetamine addiction. At the final hearing, he claimed that he was sober as a result of his incarceration. However, as found by the trial court, Father had previously gone through cycles of addiction and relapse, and he failed to take advantage of substance abuse treatment when offered by DCS, making yet another relapse all the more probable. In addition to his substance abuse issues, Father's criminal propensity is a substantial cause for concern. Father has a lengthy criminal history and was on probation at the time of the Child's removal. Instead of maintaining good behavior and striving to reunite with his Child, Father violated his probation and chose to stop visiting with the Child in order to avoid being arrested, thus placing his own interests above the Child's. After the Child's removal, Father was charged with the additional offense of burglary, and, at the time of the final hearing, was facing additional incarceration of one

to six years if convicted. Even prior to becoming incarcerated, Father had ample opportunity to demonstrate his desire and ability to put the Child's interests ahead of his own. Instead, Father quit a good job, made no effort to obtain suitable housing for the Child, did not pay support for the Child, declined to address his addiction, and refused to lead a law-abiding life. Furthermore, DCS recommended the termination of Father's parental rights, and the Child's CASA testified that termination would be in the Child's best interests. *See id.* at 1158-59. Accordingly, we find that the evidence clearly supports the trial court's determination that termination of the parent-child relationship is in the Child's best interests.

### C. *Reunification Efforts*

[23] Lastly, Father claims that the trial court erroneously terminated his parental rights in light of the fact that DCS infringed upon his constitutional rights by failing to work toward reunification during Father's incarceration. Father contends that, pursuant to Indiana Code section 31-34-21-5.5(b), "DCS has an obligation to provide reasonable efforts towards reunification." (Appellant's Br. p. 24). Thus, he claims that "[c]easing to provide the most basic services . . . while he was incarcerated was an absolute failure on the DCS to make all reasonable efforts towards reunification." (Appellant's Br. p. 24).

[24] We agree with Father that "DCS is generally required to make reasonable efforts to preserve and reunify families during CHINS proceedings." *In re H.L.*, 915 N.E.2d 145, 148 (Ind. Ct. App. 2009) (citing I.C. § 31-34-21-5.5). However, this "CHINS provision is not a requisite element of [the] parental

rights termination statute, and a failure to provide services does not serve as a basis on which to directly attack a termination order as contrary to law." *Id.* at 148 n.3. The evidence establishes that, with the exception of responding to a letter from DCS to indicate that he did not want his parental rights to be terminated, Father did not otherwise communicate with DCS from the time he attempted to evade arrest in January of 2015. Had Father even requested any services while in the DOC, it is unlikely that DCS would have been able to provide them from a logistical standpoint, which is the direct result of Father's incarceration rather than any fault of DCS. *Id.* at 148. We also find it noteworthy that there is no indication in the record that Father expressed any interest in visiting or having contact with the Child since his last visit with her in January of 2015.

[25] Moreover, Father's argument entirely disregards the efforts that DCS expended in pursuing reunification prior to Father's incarceration. Shortly after the Child was removed, DCS began offering services to Father that included home-based case management, supervised visitation, and substance abuse evaluations and treatment. Although Father initially met with the home-based case manager, briefly obtained employment, and attended visitations for a few months, he failed to take advantage of the services that DCS offered to make a substantial and lasting change in his life necessary for reunification. Significantly, DCS had arranged for Father to attend in-patient substance abuse treatment, but Father refused to go. Father also refused to submit to drug screens as required, quit his job after only three months, and was charged with a new crime. When

Father believed that a warrant had been issued for his arrest, he went into hiding and ceased all communication with DCS and the Child. Therefore, we find absolutely no merit in Father's attempt to shift the blame to DCS for his own poor choices.

## CONCLUSION

Based on the foregoing, we conclude that the trial court's order terminating Father's parental rights is not clearly erroneous.

Affirmed.

Najam, J. and Bradford, J. concur